2002 UT 120

**STATE of Utah, Plaintiff and Appellee,**

v.

**Francisco GOMEZ, Defendant and Appellant.**

No. 20001091.

Supreme Court of Utah.

Dec. 10, 2002.

Mark L. Shurtleff, Att'y Gen., Christopher D. Ballard, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Edward R. Montgomery, Salt Lake City, for defendant Kara L. Barton, Salt Lake City, for amicus Rape Crisis Center.

Douglas E. Beloof, Gina McClard, Portland, Oregon, for amicus National Alliance to End Sexual Violence.

RUSSON, Justice:

¶1 Francisco Gomez ("Gomez") was charged with rape, a first degree felony. A jury found him guilty as charged, and the trial court sentenced him to a prison term of five years to life at the Utah State Prison. He now appeals his conviction.

## BACKGROUND

¶2 On the evening of July 4, 1999, Gomez and his long-time girlfriend Michelle Segura ("Michelle") were throwing a holiday party at their home in Salt Lake City. Michelle's brother Mike Segura ("Mike") attended the party with his then girlfriend and future wife Rachelle Gallegos ("Gallegos"). Gallegos was drinking at the party, becoming intoxicated to the point of vomiting and eventually passing out. Mike moved Gallegos to Michelle's bed and left the party.

¶3 Gallegos does not remember anything from the time she passed out to the time she awoke. She remembers regaining consciousness on the couch in the living room. Gomez was on top of and engaged in sexual intercourse with her. Initially, Gallegos thought it was Mike that was on top of her, but she then realized that it was in fact Gomez. Gallegos pushed Gomez off and ran to the bathroom. Later that morning, Mike returned to pick up Gallegos. Gallegos left with Mike, and she told him that Gomez had raped her. Mike took Gallegos to the hospital.

¶4 Detective Heather Stringfellow ("Detective Stringfellow") interviewed Gomez regarding Gallegos' allegations that Gomez had raped her. Gomez admitted having sex with Gallegos but insisted that it was consensual. According to Gomez, he had awakened during the night to make sure that the front door was locked, and as he returned to his bedroom, he tripped over Gallegos and fell on top of her. Gomez claimed that Gallegos started hugging and kissing him, that she lowered her shorts while he lowered his pants, and that they had sexual intercourse.

¶5 Gomez also provided a written statement to Detective Stringfellow describing the events of that night. In his written statement, Gomez claimed that after he checked the front door, Gallegos touched him on his backside, which led to touching and kissing. Gomez explained that when they heard a noise in the bathroom they stopped what they were doing and put their clothes back on because Gallegos had expressed a fear that they might get caught.

## PROCEDURAL HISTORY

¶6 The State charged Gomez with one count of rape, a first degree felony, in violation of Utah Code Ann. § 76–5–402 (1999). On November 23, 1999, prior to trial, Gomez subpoenaed the Rape Crisis Center ("Center"), requesting "copies of all reports, documents, and interview summaries (including the report of Monica Maio) regarding Rachelle L. Gallegos." On December 10, 1999, the Center moved to quash the subpoena, arguing that the records sought by Gomez were subject to an absolute statutory privilege under the Confidential Communications for Sexual Assault Act ("Act"), Utah Code Ann. § 78–3c–4 (1996). On December 20, 1999, Gomez moved to compel discovery of the Center's records pursuant to the subpoena. The State joined the Center in opposition to the subpoena. The trial court held a hearing on the issue on March 22, 2000. In a memorandum decision on April 5, 2000, the trial court granted the Center's motion to quash the subpoena and denied Gomez's motion to compel. The trial court held that the rape crisis counselor privilege created by section 78–3c–4 of the Utah Code did not contain any exceptions that would allow or compel the trial court to conduct an in camera review of the Center's records and that even if it did, Gomez's request for documents was nothing more than a generalized fishing expedition. The trial court also held that the records were protected by Utah Rule of Evidence 506. Finally, the trial court concluded that the denial of access to the Center's records would not deprive Gomez of his constitutional right of due process of law or to confront witnesses.

¶7 At trial, Gomez sought to cross-examine Gallegos about her alleged use of a false identification card to gain entry into bars for the purpose of underage consumption of alcohol. The State opposed this line of ques-

tioning. The trial court, after hearing both parties' respective positions on the issue, prohibited Gomez from pursuing this line of questioning. The trial court held that Gallegos' alleged use of a false identification card was only slightly probative of her truthfulness and that the evidence would tend to inflame the jury against Gallegos because of the great concern in Utah over underage drinking. Therefore, the trial court concluded that "the probative value of [the] evidence [was] substantially outweighed by unfair prejudice" and prevented Gomez from cross-examining Gallegos about the alleged use of a false identification card.

¶ 8 The trial then proceeded and resulted in a jury verdict finding Gomez guilty of rape for which he was sentenced to a prison term of five years to life.

¶ 9 On appeal, Gomez argues that the trial court erred by refusing to conduct an in camera review of the Center's records regarding Gallegos and thereby deprived Gomez of his "Constitutional right to a fair trial." Furthermore, Gomez argues that the trial court committed reversible error by refusing to allow him to cross-examine Gallegos regarding her alleged use of a false identification card.

¶ 10 The State maintains that (1) the Center's records are absolutely privileged under the Act, (2) the trial court's interpretation and application of the Act as creating an absolute privilege was correct, and (3) the trial court's refusal to conduct an in camera review of the Center's records and the trial court's denial of access by Gomez to the Center's records was correct and did not deprive him of his right to a fair trial. The State also argues in the alternative that even if Gomez were entitled to an in camera review of the Center's records, he was not entitled to automatic and unfettered access but first had to have made a specific request for exculpatory evidence that he knew with reasonable certainty to exist in the Center's files, a threshold burden he failed to meet. The State also contends that the trial court did not abuse its discretion in prohibiting Gomez from cross-examining Gallegos on her alleged use of a false identification card.

## STANDARD OF REVIEW

¶ 11 " 'Generally, we review a trial court's legal conclusions for correctness, according the trial court no particular deference.' " *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 11, 54 P.3d 1177 (quoting *Orton v. Carter*, 970 P.2d 1254, 1256 (Utah 1998)). Specifically, whether the trial court properly interpreted and applied the Confidential Communications for Sexual Assault Act in this case is a question of law that we review for correctness. *See id.; State Dep't of Natural Res. v. Huntington–Cleveland Irrigation Co.*, 2002 UT 75, ¶ 12, 52 P.3d 1257. Furthermore, "the issue of '[w]hether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court.' " *Grand County v. Emery County*, 2002 UT 57, ¶ 6, 52 P.3d 1148 (quoting *State v. Daniels*, 2002 UT 2, ¶ 30, 40 P.3d 611).

¶ 12 Finally, the trial court "has broad discretion in restricting the scope of cross-examination," and on appeal the trial court's "ruling [regarding the scope of cross-examination] is reviewed under an abuse of discretion standard." *United States v. Rocha*, 916 F.2d 219, 242 (5th Cir.1990); *see also United States v. Williamson*, 202 F.3d 974, 978–79 (7th Cir.2000); *United States v. James*, 139 F.3d 709, 713 (9th Cir.1998); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 339 (2d Cir.1993). Likewise, "[t]rial courts have wide discretion in determining relevance, probative value, and prejudice." *State v. Kell*, 2002 UT 106, ¶ 27, 61 P.3d 1019. Therefore, to the extent the trial court excluded certain cross-examination testimony sought by Gomez in this case on the grounds that it lacked probative value or that the testimony's probative value would be outweighed by unfair prejudice, "we review [the trial court's] admissibility determination[ ] for abuse of discretion." *Id.* "In general, this [c]ourt will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *State v. Gentry*, 747 P.2d 1032, 1035 (Utah 1987).

## ANALYSIS

### I. CONSTITUTIONALITY OF RAPE CRISIS COUNSELOR PRIVILEGE

¶ 13 On appeal, Gomez first argues that the trial court erred as a matter of law in concluding that it did not have the authority to conduct an in camera review of the Center's records because the Act rendered those records privileged. According to Gomez, the trial court's conclusion and refusal to review the Center's records in camera infringed his constitutional right to a fair trial. In making his constitutional argument, Gomez asserts, "Under Utah R. Evid. 506(d)(1), the Fourteenth Amendment, *Ritchie*,[1] and *Cardall*,[2] trial courts are obligated to review in camera, and if material, disclose to the defendant, the information that is germane to the defense."

¶ 14 The statutory privilege at issue here was created by the Confidential Communications for Sexual Assault Act, Utah Code Ann. § 78–3c–4 (1996), and is an absolute privilege under the circumstances of this case. The Act provides:

The confidential communications between a victim and a sexual assault counselor [are] available to a third person only when:

(1) the victim is a minor and the counselor believes it is in the best interests of the victim to disclose the confidential communication to the victim's parents;

(2) the victim is a minor and the minor's parents or guardian [has] consented to disclosure of the confidential communication to a third party based upon representations made by the counselor that it is in the best interests of the minor victim to make such disclosure;

(3) the victim is not a minor, has given consent, and the counselor believes the disclosure is necessary to accomplish the desired result of counseling; or

(4) the counselor has an obligation under Title 62A, Chapter 4, to report information transmitted in the confidential communication.

*Id.* § 78–3c–4.

¶ 15 In the instant case, Gallegos was not a minor when the confidential communications were made to the sexual assault counselor at the Center and the counselor was not obligated to report any of the information in the confidential communications under Title 62A, Chapter 4.[3] Moreover, Gallegos did not consent to the disclosure of the confidential communications. Therefore, because none of the exceptions to the privilege apply in this case and Gallegos did not consent to disclosure of the confidential communications, the privilege afforded the confidential communications between Gallegos and the sexual assault counselor at the Center is absolute. Under the statute, the trial court has no authority to compel either Gallegos or the Center to produce the Center's records for an in camera review.

¶ 16 It is precisely the absolute nature of the privilege provided in this particular statute that distinguishes this case from *Ritchie* and *Cardall*. Because the statutory privilege here is absolute, *Ritchie* and *Cardall* do not control this case as Gomez suggests.

¶ 17 In *Ritchie*, the defendant was charged with rape, involuntary deviate sexual intercourse, incest, and corruption of his minor daughter. 480 U.S. at 43, 107 S.Ct. 989. The defendant's daughter reported the incidents of sexual abuse to the police, who referred the matter to the Pennsylvania Child and Youth Services agency ("PCYS"), a protective service agency charged with investigating cases of alleged mistreatment and neglect. *Id.* During pretrial discovery, Ritchie subpoenaed PCYS, seeking that agency's records concerning the daughter. *Id.* PCYS refused to comply with Ritchie's request for records, claiming that the records were privileged under Pennsylvania law. *Id.* The statute relied upon by PCYS required that all reports and other information gathered in the course of a PCYS investigation be

---

1. *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

2. *State v. Cardall*, 1999 UT 51, 982 P.2d 79.

3. The reporting obligations under Title 62A, Chapter 4 referenced in section 78–3c–4 apply where the sexual assault can be characterized as child abuse or neglect.

kept confidential. *Id.* The requirement of confidentiality was subject to eleven exceptions, one of which provided that the agency could disclose reports and information to a court of competent jurisdiction pursuant to a court order. *Id.* at 44, 107 S.Ct. 989.

¶ 18 In *Ritchie,* the United States Supreme Court held that if a defendant demonstrates that records protected by a *qualified or conditional* privilege contain evidence that is material to the defendant's defense, due process requires a trial court to review the privileged records in camera to determine whether they do, in fact, contain material evidence. The distinction between a qualified or conditional privilege and an absolute one was central to the Court's decision in that case. In holding that the defendant had a due process right to an in camera review of the privileged records in the case of the qualified privilege at issue in *Ritchie,* the Court explained:

> Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances. This is not a case where a state statute grants [P]CYS the absolute authority to shield its files from all eyes. Cf. 42 Pa. Cons.Stat. § 5945.1(b) (1982) (unqualified statutory privilege for communications between sexual assault counselors and victims).

480 U.S. at 57, 107 S.Ct. 989.

¶ 19 Immediately following this explanation that the qualified nature of the privilege at issue in *Ritchie* was key to its opinion in that case, the Court reiterated in a footnote, "We express no opinion on whether the result in this case would have been different if the statute had protected the [P]CYS files from disclosure to anyone, including law-enforcement and judicial personnel." *Id.* at n. 14. The Court clearly limited its holding in *Ritchie* to the due process implications of a qualified or conditional privilege and left for another day the question of the effect and operation of an absolute privilege in this context. *Id.*

■ ¶ 20 On appeal, Gomez merely relies on *Ritchie* and asserts that that decision controls in this case. It does not, and we do not rely on or apply *Ritchie* here. Gomez offers no legal analysis or argumentation that the *Ritchie* holding should be extended to encompass an absolute sexual assault counselor privilege. Gomez has failed to provide us with any argumentation or authority that would warrant stretching *Ritchie* beyond its current bounds. We will not make or develop Gomez's arguments for him. As we have all too often had to reiterate, " 'a reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *State v. Bishop,* 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl,* 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981)); *see also, e.g., Peterson v. Sunrider Corp.,* 2002 UT 43, n. 9, 48 P.3d 918; *Associated Gen. Contractors v. Bd. of Oil, Gas & Mining,* 2001 UT 112, ¶ 37 & n. 8, 38 P.3d 291 (citing myriad examples of inadequately briefed cases).

¶ 21 Gomez similarly relies on this court's decision in *State v. Cardall,* 1999 UT 51, 982 P.2d 79, to support his argument that he is entitled to have the trial court conduct an in camera review of Gallegos' privileged sexual assault counseling records. Again, his reliance is misplaced.

¶ 22 In *Cardall,* the defendant was charged with rape of a child. *Id.* at ¶ 1. Prior to trial, Cardall moved the court to conduct an in camera review of his victim accuser's school psychological records. *Id.* at ¶ 10. The trial court denied the motion. *Id.*

¶ 23 After his conviction by a jury, Cardall appealed, claiming that the trial court had erred in refusing to conduct the in camera review and that as a result he had been denied due process. In making his constitutional due process argument, Cardall relied on *Ritchie. Id.* at ¶ 27.

¶ 24 The privilege at issue in *Cardall* is found in rule 506 of the Utah Rules of Evidence. Rule 506 states in relevant part that "a patient has a privilege, during the patient's life, to refuse to disclose and to prevent any other person from disclosing (1) diagnosis made, treatment provided, or advice given, by a physician or mental health

therapist, (2) information obtained by examination of the patient." Utah R. Evid. 506(b); *see also* Utah Code Ann. § 58–60–113 (1998) ("Evidentiary privilege for mental health therapists regarding admissibility of any confidential communication in administrative, civil, or criminal proceedings is in accordance with Rule 506 of the Utah Rules of Evidence.").

¶ 25 We specifically recognized in *Cardall* that the privilege in rule 506 "is not absolute," *id.* at ¶ 29, and noted the significant qualification to the rule where the rule provides that "no privilege exists [as to] 'a communication relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which that condition is an element of any claim or defense.' " *Id.* (quoting Utah R. Evid. 506(d)(1)).

¶ 26 In deciding *Cardall,* this court simply applied *Ritchie* to the qualified privilege found in rule 506. *Id.* at ¶¶ 27–32. The *Cardall* decision follows the United States Supreme Court's reasoning in recognizing the qualified nature of the privilege in rule 506. *Id.* at ¶¶ 30–31. The *Cardall* decision does not provide any new or different constitutional analysis beyond that established in *Ritchie.*

¶ 27 On appeal, Gomez again merely asserts that *Cardall,* like *Ritchie,* states the legal rule governing this case, and his analysis and argument go no further than to urge us to apply those two cases. However, because *Ritchie* and *Cardall,* in adopting and applying *Ritchie,* hinge upon the distinction between qualified and absolute privileges and present a different case than the one at hand, those cases do not govern our decision here. Even if our decision in *Cardall* could be stretched to encompass an absolute privilege, Gomez has not offered any analysis, argumentation, or authority to support such an extension. Again, this court will not make Gomez's case on appeal for him. *See Bishop,* 753 P.2d at 450.

¶ 28 Besides simply relying on *Ritchie* and *Cardall,* Gomez asserts in two bald statements that the trial court's failure to conduct an in camera review infringed his constitutional rights. Gomez argues that "under Utah R. Evid. 506(d)(1),[4] the Fourteenth Amendment, *Ritchie,* and *Cardall,* trial courts are obligated to review in camera, and if material, disclose to the defendant, the information that is germane to the defense." Gomez then concludes, "The trial court incorrectly held that it did not have the authority to review the Rape Counseling Center documents and in doing so deprived [him] of his Constitutional right to a fair trial."

¶ 29 Other than his assertion that *Ritchie* and *Cardall* govern this case, Gomez offers no other independent constitutional analysis or authority supporting his two otherwise conclusory statements referencing the Fourteenth Amendment and his constitutional right to a fair trial. In this respect, Gomez has failed to adequately brief the constitutional issues in this case, and we therefore will not address them. *See Peterson,* 2002 UT 43 at n. 9, 48 P.3d 918 (declining to address inadequately briefed claim on appeal where claim was supported by "[a] single, vague sentence without citation to the record or legal authority"); *State v. Gamblin,* 2000 UT 44, ¶ 7, 1 P.3d 1108 (noting inadequacy of appellant's brief where brief failed to provide "meaningful legal analysis" and "merely contain[ed] one or two sentences stating his argument generally ... and then broadly conclude[d] that [appellant] is entitled to relief"); *State v. Jaeger,* 1999 UT 1, ¶ 31, 973 P.2d 404 (noting that adequate briefing " 'requires not just bald citation to authority but development of that authority and reasoned analysis based upon that authority' " and refusing to consider constitutional arguments for inadequate briefing where appellant merely cited relevant constitutional provisions and four cases but without any meaningful analysis of that authority

---

4. The privilege at issue in this case is not the qualified therapist-patient privilege found in rule 506, but rather the absolute sexual assault counselor-victim privilege found in the Confidential Communications for Sexual Assault Act, Utah Code Ann. § 78–3c–4 (1996). The rule 506 privilege is not applicable because the volunteer counselors at the Center are neither physicians nor mental health therapists, rendering rule 506 inapplicable in that rule 506 protects statements made only to physicians and mental health therapists.

(citation omitted)); *MacKay v. Hardy*, 973 P.2d 941, 948 n. 9 (Utah 1998) (noting numerous examples of refusal to consider inadequately briefed issues).

¶ 30 Therefore, the trial court did not err as a matter of law in interpreting or applying the statutory privilege set forth in the Confidential Communications for Sexual Assault Act and when it concluded that none of the exceptions in the statute applied in the present case, thus rendering the privilege absolute. Moreover, the trial court did not err in concluding that it had no authority under the statute or relevant case law to conduct an in camera review of the Center's records concerning Gallegos. We do not reach Gomez's argument that the trial court denied him his right to due process or a fair trial because those constitutional claims were not adequately briefed.

## II. EXCLUSION OF TESTIMONY REGARDING USE OF FALSE IDENTIFICATION CARD

¶ 31 Gomez next argues that the trial court abused its discretion when it prohibited him from cross-examining Gallegos regarding her alleged use of a false identification card in an attempt to impeach Gallegos' credibility.

¶ 32 Rule 608(b) of the Utah Rules of Evidence provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, *in the discretion of the court,* if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. . . .

Utah R. Evid. 608(b) (emphasis added).

¶ 33 A line of questioning on cross-examination regarding a witness's specific instances of past conduct that is probative of the witness's character for

truthfulness or untruthfulness, and therefore admissible under rule 608(b), may still be limited or prohibited by the trial court in its sound discretion under rule 403. *See State v. Rammel,* 721 P.2d 498, 501 (Utah 1986) (excluding impeachment testimony where potential for prejudice substantially outweighed its probative value under substantially similar predecessor rule to modern rule 403); *see also United States v. Leake,* 642 F.2d 715, 718 (4th Cir.1981) ("[Rule 608(b)] recognizes that the trial court must have discretion to apply the overriding safeguards of rule 403. . . ."); [5] *State v. Hall,* 946 P.2d 712, 722–23 (Utah Ct.App.1997); 28 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6118, at 94 (1993) ("[T]he courts recognize that Rule[ ] 403 . . . identif[ies] the principles controlling the exercise of discretion under Rule 608(b).") [hereinafter Wright & Gold]. Rule 403 of the Utah Rules of Evidence provides in relevant part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Utah R. Evid. 403.

¶ 34 Therefore, in the interplay of rules 608(b) and 403, "the court's job is to balance the probative value of specific-instances evidence against the potential dangers and costs of that evidence." Wright & Gold, § 6118, at 94. The trial court must (1) evaluate and consider the probative value of the proffered testimony, that is, the extent to which the proposed testimony is probative of truthfulness or untruthfulness, (2) determine the degree to which the proffered testimony may tend to inflame or prejudice the jury, and (3) balance the first two concerns to determine whether the danger of unfair prejudice substantially outweighs the testimony's probative value.

¶ 35 The degree of probative value can be a function of several factors, including the relative importance of the credibility of

**5.** "Although the Federal Rules of Evidence are a separate body of law from the Utah Rules of Evidence, if the reasoning of a federal case interpreting or applying a federal evidentiary rule is cogent and logical, we may freely look to that case, absent a Utah case directly on point, when we interpret or apply an analogous Utah evidentiary rule." *State v. Fedorowicz,* 2002 UT 67, n. 1, 52 P.3d 1194. Utah Rules of Evidence 608(b) and 403 are the federal rules verbatim.

the witness, the extent to which the evidence is probative of other relevant matters, the extent to which the circumstances surrounding the specific instances of conduct are similar to the circumstances surrounding the giving of the witness's testimony, the remoteness in time of the specific instances to trial, and the likelihood that the alleged specific instances of conduct in fact occurred. *See id.* at 94–96; *see also Hall,* 946 P.2d at 722.

¶ 36 In the case at hand, the record reflects that the trial court, in rendering its decision to preclude the cross-examination of Gallegos concerning her alleged use of a false identification card, considered the relevant factors in determining the probative value of the proffered testimony. Having determined that the relative probative value of the testimony was fairly low, the trial court then balanced that low value against the potential of the testimony to inflame the jury and distract them from the real issue in the case, that is, the rape charge against Gomez, and the credibility of Gallegos for truthfulness or untruthfulness. In exercising its discretion in this manner, the trial court did not abuse its discretion such that "it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted," *Gentry,* 747 P.2d at 1035, and therefore, we will not reweigh and reevaluate the relevant factors and balance for ourselves the probative value of the testimony versus its potential prejudice in this case.

## CONCLUSION

¶ 37 In sum, the trial court did not err in its interpretation and application of the privilege set forth in the Confidential Communications for Sexual Assault Act when it refused to conduct an in camera review of the Center's records, thereby denying Gomez access to the information allegedly contained therein. Because Gomez failed to adequately brief his constitutional issues on appeal, we decline to address them. Furthermore, the trial court did not abuse its discretion in prohibiting Gomez from cross-examining Gallegos about her alleged possession and use of a false identification card. Therefore, Gomez's conviction of rape is affirmed.

¶ 38 Chief Justice Durham, Associate Chief Justice Durrant, Justice Howe, and Justice Wilkins concur in Justice Russon's opinion.